# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

ERNEST JAMES YOUNG, through
Surviving Spouse MICHELLE YOUNG and
Daughter and Heir, AMANDA FRIES,

<em>Plaintiffs,</em>

v.

Case No. 22-280-EFM-GLJ

SEQUOYAH FUELS CORP. & QUIVIRA
MINING CORP.,

<em>Defendants.</em>

## MEMORANDUM AND ORDER

Ernest James Young died of pancreatic cancer in April 2020. Plaintiffs—Mr. Young's surviving spouse, Michelle Young, and daughter, Amanda Fries—bring this suit against Defendants Sequoyah Fuels Corporation ("SFC") and Quivira Mining Corporation ("QMC") alleging that Mr. Young's pancreatic cancer was caused by Defendants' negligent operation of the SFC uranium processing plant ("SFC facility") near Gore, Oklahoma. In this Order, the Court substantively addresses two pending motions to exclude: Defendants' Joint Motion to Exclude Expert Testimony of Ms. Jody Latimer (Doc. 144) and Defendants' Joint Motion to Exclude the Expert Opinions and Testimony of James Clark (Doc. 145). For the reasons explained herein, the Court grants both Motions. The Court then turns to Defendants' Joint Motion for Summary Judgment (Doc. 146). Because—without these experts' testimony—Plaintiffs cannot offer evidence of causation to support their negligence claims, the Court grants summary judgment in favor of Defendants. The five remaining pretrial motions are denied as moot.

## I.    Factual and Procedural Background

Mr. Young was born in Gore, Oklahoma in 1962. He lived in and around Gore until mid-1984 when he moved to California and eventually to Fort Collins, Colorado. Mr. Young was diagnosed with pancreatic cancer in 2018 and died in April 2020.

In 1970, the Atomic Energy Commission ("AEC") licensed the SFC facility to process uranium. The SFC facility is about two miles southeast of Gore, situated just north of Interstate 40 near the confluence of the Arkansas and Illinois rivers. The AEC license was issued to "Sequoyah Fuels Corporation"[1] which, at the time, was a wholly owned subsidiary of Kerr-McGee Nuclear Corporation. Kerr-McGee Nuclear Corporation later changed its name to Quivira Mining Corporation and is Defendant QMC. The SFC facility ceased operations in 1993.While it was in operation, the SFC facility primarily produced uranium hexafluoride ($UF_6$) for use in nuclear reactor fuel rods. And from 1973 until at least 1986, the SFC facility was licensed to test the use of treated raffinate, a by-product of the facility's process, as a fertilizer in fields near the SFC facility.

Plaintiffs allege that, in operating the SFC facility, Defendants mishandled and released hazardous toxic contaminants which contaminated the air, soil, surface water, and groundwater beyond the SFC facility. Further, Plaintiffs allege that during his developmental years, Mr. Young spent almost all his time in close proximity to the SFC facility, drinking contaminated water,

---

[1] Defendants draw distinctions between "Old Sequoyah Fuels" which changed its name to "Sequoyah Fuels International Corporation" in 1990, and "New Sequoyah Fuels Corporation" which changed its name to "Sequoyah Fuels Corporation" in 1990. Defendant SFC is the latter "Sequoyah Fuels Corporation" f/k/a "New Sequoyah Fuels Corporation." Defendants contend that the license to operate the SFC facility was initially issued to "Old Sequoyah Fuels" in 1970. In 1989 "Old Sequoyah Fuels" transferred its assets and ongoing business to "New Sequoyah Fuels Corporation." The parties dispute the nature of this transfer and its effect on Defendant SFC's liability as a successor under Oklahoma law. Because the Court grants summary judgment on other grounds, this dispute is immaterial.

swimming in contaminated water, eating food grown in contaminated soil, working in the contaminated hay fields, and breathing toxic gases released by the SFC facility.

Plaintiffs have designated two experts to establish the causal link between Defendants' operation of the SFC facility and Mr. Young's diagnosis of, and resulting death from, pancreatic cancer. These experts are Dr. James Clark and Ms. Jody Latimer.

**A.    Dr. James Clark**

Dr. Clark holds a Ph.D. in Environmental Health Sciences from the University of California, Los Angeles School of Public Health ("UCLA"). In his expert report, Dr. Clark opines:

A.  Mr. Ernest James Young was diagnosed with pancreatic cancer at the age of 56 and succumbed to the cancer at age 57. This early onset of cancer is unusual for pancreatic cancer patients;

B.  A specific causation analysis of Mr. Young's risk factors identified several factors that could have contributed to his development of pancreatic cancer, including his childhood exposure to emissions from the Sequoyah Fuels Corporation (SFC) Facility in Gore, Oklahoma;

C.  The history of the operations of the SFC plant in Gore, Oklahoma is riddled with releases that allowed radioactive materials to reach surface waters, groundwater; were contained in soils onsite; releases to the air, and included treated raffinate used as a fertilizer;

D.  Testing of Mr. Young's cremains shows concentrations of radioactivity at 2 to 4.5 times higher rates than those measured in cremains tested from Colorado.[2]

Dr. Clark arrived at these conclusions after reviewing documents provided by Plaintiffs' counsel, Mr. Young's medical records, various literature regarding radionuclides in the environment, and Nuclear Regulatory Commission ("NRC") files concerning the operation of the SFC facility. Dr. Clark also collected a sample of Mr. Young's cremains and tested it for radiation.

---

[2] Doc. 145-1, at 1.

**B.    Ms. Jody Latimer**

Ms. Latimer is a registered nurse and holds a Master's Degree in Public Health. She has over 20 years of clinical and leadership experience. In her expert report, she opines:

> Based on the findings, there is compelling evidence linking Mr. Ernest James Young's exposure to radioactive materials from Kerr-McGee/Sequoyah Fuels Corporation to his development of pancreatic cancer. Elevated cancer rates in the area, combined with testimony from residents and documented environmental contamination, underscore the plausibility of this connection. This case underscores the importance of assessing environmental risk factors as a pivotal element in the development of cancer in Mr. Ernest James Young.[3]

Ms. Latimer arrived at these conclusions after reviewing NRC reports and the mortality and cancer rates in Sequoyah County. She also interviewed current and former residents of Gore, Oklahoma and former employees of the SFC facility.

## II.    Analysis

Defendants' motions to exclude Dr. Clark and Ms. Latimer challenge their qualifications and the reliability of their opinions. Federal Rule of Evidence 702 governs expert testimony, and the Court turns to that rule in addressing Defendants' challenge. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[4]

---

[3] Doc. 144-1, at 5.

[4] Fed. R. Evid. 702.

Rule 702 imposes a "gatekeeping role" upon the district court to ensure that expert testimony is relevant and reliable.[5] To fulfill this role, the court engages in a two-step analysis.[6] The first step is to determine whether the expert "has a reliable basis in the knowledge and experience of his or her discipline."[7] Second, if the expert is qualified, the court must determine whether their opinion is "reliable."[8]

The party offering the expert testimony bears the burden of showing that the expert's testimony is admissible.[9] Ultimately, "rejection of expert testimony is the exception rather than the rule."[10] While *Daubert* makes the court the gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence."[11] District courts have broad discretion to determine whether a proposed expert may testify.[12] But the district court must "make specific factual findings on the record which are sufficient for an appellate court to review the trial court's conclusion concerning whether the testimony was scientifically reliable and factually relevant."[13]

---

[5] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

[6] *Roe v. FCA US LLC*, 42 F.4th 1175, 1180–81 (10th Cir. 2022).

[7] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 592) (internal quotation marks and alterations omitted).

[8] *Roe*, 42 F.4th at 1181.

[9] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)).

[10] Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

[11] *Daubert*, 509 U.S. at 596 (citation omitted).

[12] *United States v. Nichols*, 169 F.3d 1255, 1265 (10th Cir. 1999).

[13] *Bitler*, 400 F.3d at 1232 (citing *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)).

In support of their motions to exclude, Defendants submitted expert rebuttal reports written by health physicist, Dr. Alan Fellman; radiation oncologist, Dr. Phillip Beron; and Dr. Jesse Toepfer, who has expertise in managing radioactive materials. The Court has reviewed each of Plaintiffs' and Defendants' experts' reports, the academic literature cited by Dr. Clark, and the transcripts from Dr. Clark's and Ms. Latimer's depositions. The Court will address the motions to exclude Dr. Clark and Ms. Latimer in turn.

## A.    Motion to Exclude Dr. Clark's Opinion and Testimony

Defendants move to exclude the opinions and testimony of Dr. Clark on the following grounds:

> 1. Courts have repeatedly excluded Dr. Clark as testifying expert under *Daubert* and Rule 702, including in the previous cases where he attempted to proffer opinion involving radiation, uranium exposure, and radiation dosimetry;
>
> 2. Dr. Clark failed to perform any necessary epidemiological assessments or analyses to establish the amount or pathway of radiation exposure supposedly released by the Sequoyah plant;
>
> 3. Dr. Clark made no attempt to quantify the amount or radiation dose supposedly received by Mr. Young (or absorbed by his pancreas) in order to causally connect the alleged radiation exposure in Gore to Mr. Yong's later development of pancreatic cancer;
>
> 4. Dr. Clark's opinions are unreliable because he ignores that *no uranium radiation was found in Mr. Young's cremains*, he failed to account for the presence of natural background radiation in the cremains, and he miscalculated the purported "total body burden" of radiation from Mr. Young's cremains, contrary to the principles of radiation science and the methodology outlined in the Ibrahim & Simon study;
>
> 5. Dr. Clark's opinions are unreliable and speculative because he ignores Mr. Young's known risk factors for pancreatic cancer including obesity, prior tobacco use, family history of cancer, cholecystectomy (gallbladder removal), genetic ancestry, and a CFTR gene mutation scientifically known to increase the risk of pancreatic cancer; and,
>
> 6. Dr. Clark has reverse-engineered his "methodologies" to reach the desired conclusion sought, in direct contradiction to existing scientific, radiological, and medical science, such that his opinions constitute nothing more than *ipse dixit*.

The Court will address Defendants' concern with Dr. Clark's testimony by going through the two-step analysis of analyzing Dr. Clark's qualifications and then the reliability of his opinions.

### 1. Step One: Qualification

To be qualified, "[a]n expert must possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.'"[14] An expert who "possesses knowledge as to a general field" but "lacks specific knowledge does not necessarily assist the jury."[15]

Defendants challenge Dr. Clark's qualification to testify as an expert by pointing out that several other federal courts have excluded Dr. Clark's opinions as unreliable. Indeed, several courts have excluded Dr. Clark's opinions and testimony for various reasons.[16]

Plaintiffs respond by highlighting Dr. Clark's education and experience. Dr. Clark holds a Ph.D. in Environmental Health Sciences from UCLA. He has over 30 years of experience in environmental consulting, specializing in dose reconstruction and the evaluation of human health impacts from environmental contaminants. He has expertise in toxicology, air pollution modeling, environmental fate and transport modeling, and human health risk assessments. He has conducted research into epidemiological evaluations of populations exposed to pollutants. He completed his

---

[14] *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

[15] *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (citation omitted).

[16] *See, e.g.*, *Butler v. Mallinckrodt LLC*, 2022 WL 970876, at *16 (E.D. Mo. Mar. 31, 2022) ("[Dr. Clark's] method of calculating the natural background level of radiation [has not] been tested, subjected to peer review, or shown to be generally accepted in the scientific community. Clark's methodology . . . was created for litigation without relevant scientific support."); *In re Deepwater Horizon Belo Cases*, 2024 WL 4349466, at *7 (N.D. Fla. Sept. 30, 2024) (finding Dr. Clark's cancer risk assessment unreliable and unhelpful in part because the study he relied upon was related to risks of developing cancer generally rather than prostate cancer as the facts of that case required); *Williams v. BP Expl. & Prod. Inc.*, 2024 WL 340237, at *12 (S.D. Miss. Jan. 30, 2024), *aff'd*, 143 F.4th 593 (5th Cir. 2025) ("The Court finds that Dr. Clark's purported general and specific causation opinions are unreliable and inadmissible.").

doctoral thesis on a novel multi-pathway risk model. He has been published numerous times, and he has consulted or testified in a number of litigation matters. Dr. Clark's CV makes clear that he is qualified to render opinions regarding dose reconstruction, air pollution modeling, environmental fate and transport modeling, epidemiological evaluations, pathway risk modeling, and other related concepts. However, it appears that Dr. Clark does not pull on his knowledge or experience to arrive at his conclusions regarding the cause of Mr. Young's pancreatic cancer. Rather, Dr. Clark's opinions hinge upon a radiation dosimetry calculation.[17]

Radiation dosimetry is an area in which Dr. Clark has less experience. A review of his CV reveals that none of his publications involve or relate to radioactive materials.[18] And Dr. Clark has previously testified that he taught himself radiation dosimetry.[19] Dr. Clark's "lack of education, training, or experience in the specific area of radiation dosimetry or closely related fields" has been recognized by the United States District Court for the Eastern District of Missouri.[20] As will be seen in the next step's analysis, regardless of whether Dr. Clark's education and experience in radiation dosimetry qualify him as an expert in this specific field, the Court does not find Dr. Clark's opinions reliable.

---

[17] Doc. 145-2, at 117 (containing Dr. Clark's deposition testimony in which he identifies "the crux of the argument" as Mr. Young's cremains' elevated levels of radiation).

[18] Dr. Clark testified in deposition that, in one study, he injected rats with tritiated thymidine (a radioactive material) as a tracer or marker. However, he did not make a radiation dosimetry calculation as part of that study. Doc. 145-2, at 84.

[19] Doc. 145-8, at 6.

[20] *Butler*, 2022 WL 970876, at *16 n.12.

2.      *Step Two: Reliability*

To assess reliability, the Court asks "whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case."[21] The Tenth Circuit has explained this requirement:

> The Supreme Court's decision in *General Electric v. Joiner* offers a good illustration of the requirement that expert testimony must be based on sufficient facts or data. The Court held that the district court did not abuse its discretion in rejecting expert opinions that plaintiff's exposure to toxins caused his lung cancer because the opinions were based on animal studies that could not be extrapolated to humans. Opinion evidence need not be admitted when it "is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[22]

The reliability inquiry also requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[23] In making this determination, the district court must focus on the expert's methodology rather than the expert's conclusions.[24] A court may consider the following factors in determining whether an expert's methodology is valid:

> (1) whether the opinion or theory is susceptible to testing and has been subjected to such testing; (2) whether the opinion or theory has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been generally accepted in the scientific community.[25]

---

[21] *Roe*, 42 F.4th at 1182 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[22] *Rodgers*, 759 F. App'x at 658 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

[23] *Id.* at 659 (quoting *Daubert*, 509 U.S. at 592–93).

[24] *Id.* (citing *Daubert*, 509 U.S. at 595).

[25] *Hoffman v. Ford Motor Co.*, 493 F. App'x. 962, 974 (10th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94).

These factors are not exclusive.[26] "Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"[27] The Court addresses issues with the method by which Dr. Clark tested Mr. Young's cremains, his assessment of the history and operation of the SFC facility and its link to elevated radiation values in the Mr. Young's cremains, how he arrived at his conclusions regarding Mr. Young's radiation exposure, and the literature to which he cites.

  a. Cremains Testing

Dr. Clark concludes that the Mr. Young's cremains had "concentrations of radioactivity at 2 to 4.5 times higher rates than those measured in cremains tested from Colorado."[28] Dr. Clark arrived at this conclusion after collecting a sample from Mr. Young's cremains, sending them to a lab to test for radiation, and then comparing the radiation values he calculated to the values reported in the Ibrahim study.[29] But there are several notable deviations from the Ibrahim study's method and Dr. Clark's method of calculating the "total body burden" of cremains.

The objective of the Ibrahim study was to provide estimates of total body contents of some natural radionuclides based on *whole-body* human ash analysis. As such, the Ibrahim study took whole-body ashes from nine cremated humans, ground them, homogenized them, and then tested

---

[26] *Id.* (citing *Daubert*, 509 U.S. at 594).

[27] *Dodge*, 328 F.3d at 1222–23 (quoting *Kumho*, 526 U.S. at 152).

[28] Doc. 145-1, at 1.

[29] *See generally* S.A. Ibrahim & S.L. Simon, *Natural Radionuclide Contents in Human Whole-Body Ashes*, 243(2) J. of Radioanalytical and Nuclear Chemistry 483 (2000).

a portion of the ashes for radiation.[30] Here, Dr. Clark collected a sample of Mr. Young' ashes from an urn given to him by Plaintiff Fries which contained only part of the ashes resulting from Mr. Young's cremation. He collected the sample from the top of the ashes contained in the urn. He did not homogenize the ashes before taking the samples or sending them for testing. According to the Ibrahim study, this may present an issue because "[i]t is known that the distribution of these radionuclides are not uniform throughout the human skeleton ranging over an order of magnitude between the different bone types."[31] Without the homogenized, whole-body ashes, Dr. Clark's testing is not appropriately compared to the results of the Ibrahim study.

Next, Dr. Clark did not test for the same radionuclides as the Ibrahim study. The Ibrahim study tested cremains for Uranium-238 ($^{238}$U), Radium-226 ($^{226}$Ra), Radium-228 ($^{228}$Ra), Thorium-228 ($^{228}$Th), Cesium-137 ($^{137}$Cs), and Potassium-40 ($^{40}$K). Dr. Clark tested Mr. Young's cremains for total alpha emissions, total beta emissions, and Strontium-90 ($^{90}$Sr). Dr. Clark explains that his testing was focused on making sure that generalized radiation was present "above the background value" rather than for the presence of any particular radionuclide.[32] Dr. Clark ascertained the "background value" of radiation by adding together the reported value of each radionuclide tested for in the Ibrahim study.[33] Dr. Clark compared this compiled background value from the Ibrahim study to the combined value of alpha and beta radiation present in Mr. Young's

---

[30] *Id.* at 485.

[31] *Id.* at 483.

[32] Doc. 145-2, at 194.

[33] For example, the average value reported in the Ibrahim study after testing the cremains, measured in becquerels (Bqs) was: 1.0 Bq for $^{238}$U; 3.2 Bq for $^{226}$Ra; 2.3 Bq for $^{228}$Ra; 1.3 Bq for $^{228}$Th; 0.42 Bq for $^{137}$Cs; and 820 Bq for $^{40}$K. Dr. Clark added these values together to get a total average radiation value of 828.22 Bq. Adding the values together is not a step taken in the Ibrahim study. Dr. Clark did this for the average, median, and maximum values.

cremains sample.[34] After Dr. Clark's calculations, the average value of total radiation in the Ibrahim study was 828.22 Bq and 3774.94 Bq in Mr. Young's cremains. From these figures, Dr. Clark concluded that the radiation from Mr. Young's cremains was "significantly higher than [the] reference point from the Ibrahim study."[35] From this, he inferred that Mr. Young was exposed to radiation at a significant dose over his life and that it was unnecessary to try to break down the radiation values by radionuclide.[36] But without testing for the same radionuclides in cremains that the Ibrahim study did, but rather relying on a consolidated value of generalized radiation, Dr. Clark is not conducting a true comparison.

Finally, Dr. Clark did not subtract the value of "background radiation" from the tested cremains. The Ibrahim study corrected their initial radiation values by subtracting out radiation attributable to the instruments they used to detect radiation and for what they calculated was attributable to $^{40}K$. Dr. Clark insists that he did not need to subtract out detector background because the lab that he employed used different equipment that would not skew the radiation value results. But he admits that his report does not take account or correct for the presence of $^{40}K$ as "background radiation."[37] Had Dr. Clark done so, as the researchers in the Ibrahim study did, his calculation of the total radiation emitting from Mr. Young's cremains would have necessarily been lower.

Dr. Clark recognizes that he did not employ the same methodology as the researchers in the Ibrahim study; nevertheless, he believes that his testing method provides an apples-to-apples

---

[34] Dr. Clark did this by adding the value of alpha radiation detected with the beta radiation detected and then multiplying that value by the estimated mass of Mr. Young's whole-body cremains.

[35] Doc. 145-2, at 194.

[36] Id.

[37] Doc. 145-2, at 200–01.

comparison.[38] But Dr. Clark's modified method of calculating body burden was not subject to peer-review, has not been duplicated, nor is it evident that Dr. Clark implemented any controls. The deviations described above and the lack of control or duplication are particularly concerning in light of the Ibrahim study's noted "potential sources of error" that might contribute additional radioactivity or losses in radioactivity to the tested sample[39] and their recognition that "little useful information can be gained" in comparing their measurements of $^{40}K$ and $^{137}Cs$ with values from other literature.[40] Overall, Dr. Clark provides little explanation as to how using a different method of collecting ashes, testing for general levels of radiation rather than specific radionuclides using different equipment, and using different calculations enables him to conduct a reliable side-by-side comparison between his results and the Ibrahim study.

      b.   Link Between History and Operation of SFC Facility and Elevated Radiation

Dr. Clark's opinion that the elevated radiation observed in Mr. Young's cremains is linked to the deficiencies in the SFC facility's operation is unreliable. Dr. Clark opines that "[t]he history of the operations of the SFC plant . . . is riddled with releases that allowed radioactive materials to reach surface waters, groundwater; were contained in soils onsite; releases to the air, and included treated raffinate used as a fertilizer."[41] Dr. Clark supports this opinion in his report with several tables identifying elevated radionuclide levels in water, gaseous emissions, and soil samples collected during the SFC facility's operation. Each of the tables notes increases in alpha particles

---

[38] Doc. 145-2, at 178–79.

[39] Ibrahim & Simon, *supra* note 29, at 489 (noting potential sources of error include contamination of ash samples from the cremation oven or the cremation box and the loss of ash due to poor sample collection technique).

[40] *Id.* at 489.

[41] Doc. 145-1, at 1.

or uranium levels.[42] Dr. Clark concludes that "it is clear . . . that effluent emission from the SFC were known to have a significant impact on the concentration of radionuclide content in surface waters outside of the SFC boundaries."[43]

Dr. Clark also documents "releases documented by non-NRC sources inside and outside of the site boundaries collected by outside parties."[44] These documented releases indicated that there were unintended uranium releases, issues with raffinate storage, or elevated levels of non-radioactive metals in groundwater.[45]

Finally, Dr. Clark identifies that the SFC facility ran a raffinate fertilizer program. Importantly, Dr. Clark describes that "[t]he original application of SFC-N [fertilizer] contained trace amounts of uranium (0.64 to 0.86 µg/g) and radium (0.29 to 2.9 pCi/L)"[46] In sum, Dr. Clark's report makes clear that he believes that Mr. Young's radiation exposure was from the SFC facility's documented leaks of uranium, increase in alpha particles in the river downstream of the SFC facility, and the raffinate fertilizer which contained trace amounts of uranium.

But the results of Dr. Clark's testing do not appear to support his conclusion that the radiation found in Mr. Young's cremains are linked to the SFC facility. The various deficiencies that Dr. Clark identifies at the SFC facility would necessarily require that Mr. Young was exposed to uranium or alpha particles. But Mr. Young's cremains did not show elevated levels of uranium or alpha particles.

---

[42] *See id.* at 25–35.

[43] *Id.* at 35–36.

[44] *Id.* at 36.

[45] *Id.* at 36–37.

[46] *Id.* at 37.

Notably, Dr. Clark did not test for the presence of uranium in Mr. Young's cremains.[47] And the cremains testing did not find an increase in radiation due to the presence of alpha particles.[48] This is confusing in light of Dr. Clark's acknowledgment that when a tissue or bone is exposed to radiation from uranium, one would expect to find the presence of alpha, beta, and gamma radiation when tested.[49] Here, Mr. Young's cremains only indicated elevated levels of beta radiation.

In sum, Dr. Clark opines that Mr. Young's cremains contained an elevated level of radiation as a result of his exposure to uranium-contaminated waters and raffinate with trace amounts of uranium, and he acknowledges that one would expect to find the presences of all three types of radiation when a tissue or bone is exposed to uranium radiation—alpha, beta, and gamma. But Mr. Young's cremains only show elevated levels of beta radiation.

Plaintiffs respond to this logical hiccup by stating that "there is no reason to suspect that uranium radiation would contribute to any substantial level of radiation" because "[t]he entire purpose of Defendants' facility was to remove as much uranium as possible."[50] As such, Plaintiffs appear to argue that uranium is not the radioactive material that Mr. Young was exposed to.[51] But this is entirely inconsistent with Dr. Clark's report which identifies increased levels of uranium

---

[47] Doc. 145-2, at 180 ("I wasn't testing for uranium.").

[48] 145-1, at 40 (reporting that the alpha emitters were not detected above the minimum detectable level).

[49] Doc. 145-2, at 180 (answering "Yes, if you're directly exposed to uranium.").

[50] Doc. 162 at 15.

[51] This stands in stark contrast to what Plaintiffs allege in their Second Amended Complaint. Namely, that Mr. Young "was exposed to uranium, uranium-containing contaminates, and other toxic and radioactive substances." Doc. 74, at ¶ 6.

and alpha particles in the rivers downstream of the SFC facility[52] and trace amounts of uranium in the raffinate fertilizer to which Mr. Young was purportedly exposed. The internal inconsistency of Dr. Clark's reasoning does not give the Court confidence that Dr. Clark's opinion is reliable.

###### c.  Mr. Young's Radiation Exposure

This logical incoherence becomes even more pronounced when considering Dr. Clark's theory regarding the way Mr. Young was exposed to Defendants' radiation. As discussed above, Dr. Clark has extensive training and experience in dose reconstruction, air pollution modeling, environmental fate and transport modeling, epidemiological evaluations, and pathway risk modeling. But Dr. Clark does not implement these specific skills in this case. He makes no effort to quantify the amount or type of radiation that Mr. Young was exposed to.

In his deposition, Dr. Clark acknowledged that he did not conduct a "typical dose assessment" in which he would have gathered "the concentrations out in the environment" calculating "the amount that someone would have come in contact with" and determining the "amount that would have been absorbed" and "finally, the amount that's committed to each one of the organs."[53] Dr. Clark posits that he did not need to do this typical assessment because the end goal of this process is to calculate the "body burden."[54] And here, because Dr. Clark was able to calculate the "body burden" from Mr. Young's cremains, he did not believe it necessary to gather the additional information to conduct a typical dose assessment to conclude that Mr. Young was exposed to Defendants' radiation. Rather, he relies upon an assumption that, because Mr. Young's

---

[52] *See* Doc. 145-1, at 32 ("The impact of the plant on surface waters was documented initially in monitoring results of surface waters (from 1972) in a draft Environmental Assessment showing an increase in the amount of gross alpha radiation, gross beta radiation, and uranium in the Illinois River downstream of the SFC facility.").

[53] Doc. 145-2, at 102.

[54] *Id.*

cremains contained elevated levels of radiation, the radiation must have come from the SFC facility.

Dr. Clark makes this logical leap by coupling his test results with information provided to him by counsel. Specifically, Dr. Clark infers that because Mr. Young was born and lived near the SFC facility this must have been where Mr. Young was exposed to the highest amount of radiation over the course of his life.[55] Dr. Clark does not point to evidence that Mr. Young drank, swam, played, or fished in a *particular* contaminated body of water. Rather, he merely assumes that because Mr. Young lived near the SFC facility he *could* have internally ingested radiation from the SFC facility.[56] When asked whether he was aware of any evidence that Mr. Young had radiation exposure from the SFC facility while living near Gore, Dr. Clark responded: "[s]o that's a really tricky question because the records don't reflect that in particular. So what I'm left with is looking at what was in his body."[57]

Instead of pointing to any evidence that Mr. Young was actually exposed to radiation from the SFC facility, Dr. Clark relies on an assumption that because Mr. Young lived near the SFC facility and the facility's water sampling indicated that there was an increase in uranium and

---

[55] *Id.* at 104.

[56] *Id.* ("[T]he one area that he lived in that had the highest source of radiation that he would have received internally, so he could have breathed it in, he could have drank it, he could have eaten it, whatever the case was, is the particular area [near Gore, Oklahoma].").

[57] *Id.* at 106.

Radium-226 that Mr. Young must have been exposed to these contaminants.[58] But proximity to a contaminant is not enough to establish causation.[59]

### d. The Cited Literature

Finally, even the literature that Dr. Clark relies upon does not support his conclusions regarding causation. Dr. Clark's report purports to establish a general causal link between radiation exposure and pancreatic cancer by citing studies that he says support his conclusion that radiation exposure is linked to pancreatic cancer. But Dr. Clark stretches the conclusions of these studies beyond their capacity.

One primary study that Dr. Clark relies upon is BEIR V,[60] which he appears to quote as saying "among occupationally exposed persons, an excess in the number of deaths from pancreatic cancer was reported among British radiologists who entered the practice of radiology before 1921 . . . . The excess number of deaths from pancreatic cancer was confirmed in a recent follow-up study."[61] However, upon review of the study, the last sentence in the paragraph that Dr. Clark cites conveys the exact opposite: "[t]he excess has *not* been confirmed by more recent follow-up."[62] Further, BEIR V's summary of the effect of radiation on the pancreas concludes "[a]n association between cancer of the pancreas and irradiation, suggested by several reports in the past,

---

[58] *Id.* at 143 ("I'm making an assumption based on the sampling that was performed by [Defendants] during the time of operation showing that there was an increase downstream. Where that exactly goes and where his exposure point was, I can make assumptions about. . . . I know now that it was contaminated. And before the plant was operated, it wasn't contaminated. After the plant was operating or built, then his contamination started.").

[59] *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 272 (3d Cir. 2017) (requiring an expert's opinion to be based on "more than an assumption about the effect of living within a mile of the [facility containing radioactive materials].").

[60] *See generally* Nat'l Rsch. Council, Comm. on Biological Effects Ionizing Radiations, *Health Effects of Exposure to Low Levels of Ionizing Radiation: BEIR V* (1990).

[61] Doc. 145-1, at 15.

[62] Doc. 145-10, at 15 (emphasis added).

has not been confirmed in more recent and thorough studies of irradiated human populations. The pancreas appears, therefore, to be relatively insensitive to radiation carcinogenesis."[63] Dr. Clark omits this conclusion from his report.

The three other studies that Dr. Clark cites similarly contradict or undercut his conclusions regarding causation. One study concludes that "[t]he epidemiological evidence for an association between radiation exposure and pancreas cancer is weak."[64] When asked about this study's conclusion in his deposition, Dr. Clark acknowledged the weakness of the causal connection but provided no explanation for why he ignored the report's conclusion.[65] Another study cited by Dr. Clark looks at occupational risk factors linked to pancreatic cancer.[66] But notably, here, Mr. Young was not occupationally involved with the SFC facility, rendering the conclusions of this study minimally applicable. Two other studies examined the increased risk of pancreatic cancer to patients who underwent high-dose radiation therapy or intensive chemotherapy.[67] High-dose radiation therapy is not similar in type or dose to the radiation that Mr. Young was purportedly exposed to when he swam in, drank from, and fished in the contaminated waters and worked in a field treated with the SFC facility's raffinate.

In sum, it does not appear that Dr. Clark's opinions regarding general causation between radiation and pancreatic cancer are informed by the scientific literature to which he cites, and in at

---

[63] *Id.*

[64] R.J. Black et al., *Cancer Incidence in a Population Potentially Exposed to Radium-226 at Dalgety Bay, Scotland*, 69(1) British J. Cancer, 140, 140 (1994).

[65] Doc. 145-2, at 210 ("It's weak, but it's not saying it doesn't happen.").

[66] *See generally* T. Kauppinen et al., *Pancreatic Cancer and Occupational Exposures*, 6(5) Epidemiology 498 (1995).

[67] *See generally* G.M. Dores, et al., *Pancreatic Cancer Risk after Treatment of Hodgkin Lymphoma*, 25(10) Annals of Oncology 2073 (2014); Michael Hauptmann, et al., *Increased Pancreatic Cancer Risk Following Radiotherapy for Testicular Cancer*, 115(7) British J. Cancer 901 (2016).

least two cases, the literature directly disclaims the conclusion that Dr. Clark wants to draw—that radiation exposure is linked to pancreatic cancer.

        e.   Conclusion

The Court concludes that Dr. Clark's opinions are unreliable because, at root, they are conclusions in search of a justification. The studies Dr. Clark relies upon do not support his general causation opinion, Dr. Clark makes assumptions about the manner in which Mr. Young was exposed to radiation from the SFC facility, the test results of Mr. Young's cremains seem to contradict the manner by which Dr. Clark assumes Mr. Young was exposed to the SFC facility's radiation, and the method by which he conducted his test deviates from the study he cites. Independently, and cumulatively, these reasons cause the Court to find Dr. Clark's opinions unreliable. As such, the Court grants Defendants' motion to exclude Dr. Clark from offering his opinion or testifying before a jury.

**B.    Motion to Exclude Ms. Latimer's Testimony**

Defendants move to exclude Ms. Latimer's expert testimony by asserting that she has no specialized education, training, or experience to render an opinion regarding the causal link to radiation exposure and pancreatic cancer.

Plaintiffs urge the Court not to conduct a *Daubert* analysis of Ms. Latimer's testimony because she relies upon her expertise as a seasoned medical professional and analytical reasoning, rather than on any experiments or scientific method to develop her conclusions. Plaintiffs cite *Compton v. Subaru of America, Inc.*[68] to support this proposition. There, the Tenth Circuit determined that an engineer drawing upon "general engineering principles" and "twenty-two years of experience as an automotive engineer" did not base his opinion on "any particular methodology

---

[68] 82 F.3d 1513 (10th Cir. 1996).

or technique" and as such "*Daubert* simply ha[d] little bearing" on his testimony.[69] However, this holding was overruled by the Supreme Court in *Kumho Tire Company, Ltd. v. Carmichael*.[70] As such, Defendants appropriately request this Court to conduct a *Daubert* inquiry into Ms. Latimer's testimony and opinions. As before, the first step is for the Court to determine whether Ms. Latimer possesses the necessary qualifications to render the opinion she offers.

Ms. Latimer is a registered nurse with a Master's Degree in Public Health. Aside from taking semester long courses in toxicology and epidemiology in pursuit of her Master's Degree, she has no particular training or experience in radiation or oncology. Ms. Latimer's clinical experience as a nurse is in cardiovascular intensive care, emergency departments, and occupational health. She has not published any scientific or peer-reviewed studies on any matter. In her CV, she lists that she is a Nurse Consultant for Brent Blackstock, PLC and in that role she "conducted disease investigations and provided expert witness consultation" and "[r]eviewed federal regulations, medical records, and environmental exposure reports."[71] But in her deposition, Ms. Latimer confirmed that her work on Plaintiffs' present case is her only experience in this role.

Plaintiffs insist that Ms. Latimer is qualified to offer an expert opinion "on any matter of medical science, particularly as it relates to matter of disease diagnosis" by pointing to her nursing license and her Master's Degree.[72] But "[i]n the medical-expert context, the general rule is that mere possession of a medical degree does not qualify a doctor to testify about a subject in which

---

[69] *Id.* at 1519.

[70] 526 U.S. 137, 147 ("The initial question before us is whether this basic gatekeeping obligation applies only to "scientific" testimony or to all expert testimony. We, like the parties, believe that it applies to all expert testimony.").

[71] Doc. 144-1, at 8.

[72] Doc. 161, at 8.

he does not specialize."[73] "The question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question."[74] Here, Ms. Latimer's qualification as a nurse, and her Master's Degree in Public Health do not cloak her with the authority to render opinions specific to oncology, radiation exposure, or the relation between the two. In sum, there is no indication that Ms. Latimer has the qualification to answer questions about radiation exposure's role in the cause of pancreatic cancer.[75] As such, the Court grants Defendants' motion to exclude Ms. Latimer from testifying as an expert before a jury.

## C.    Motion for Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[76] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[77] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[78] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[79]

---

[73] *Jorgensen v. Ritz-Carlton Hotel Co. LLC*, 2017 WL 11545378, at *2 (D. Colo. Sept. 29, 2017) (citing *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)).

[74] *Id.* (citation and internal quotations marks omitted).

[75] *See Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1276, 1281 (N.D. Okla. 2000) (finding an emergency room physician's medical degree alone insufficient qualification for a doctor to render an opinion regarding medical causation of spine-related ailments).

[76] Fed. R. Civ. P. 56(a).

[77] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[78] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[79] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[80] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[81]

To prevail on their negligence claim Plaintiffs must show: "(1) a duty owed by the defendant to protect plaintiff from injury (2) failure to fulfill that duty and (3) injuries to plaintiff proximately caused by defendant's failure to meet the duty."[82] And the elements to satisfy their negligence per se claim are "(1) the violation of a statute must have caused the injury, (2) the harm sustained must be of the type intended to be prevented by the statute and (3) the injured party must be one of the class intended to be protected by the statute."[83]

Defendants assert that they are entitled to summary judgment because, without either Dr. Clark or Ms. Latimer's testimony and opinions, Plaintiffs cannot meet the causal elements of their negligence claim or their negligence per se claim. The only evidence that Plaintiffs cite to in their response comes from Dr. Clark and Ms. Latimer.[84] Because the Court has excluded their testimony, Plaintiffs lack any evidence on this necessary element in both of their claims. As such, Defendants are entitled to summary judgment.

---

[80] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[81] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[82] *Fargo v. Hays-Kuehn*, 352 P.3d 1223, 1227 (Okla. 2015).

[83] *Nye v. BNSF Ry. Co.*, 428 P.3d 863, 873 (Okla. 2018) (citation and internal quotation marks omitted).

[84] Plaintiffs make a passing reference to another's testimony, Dr. Matthew, that may support the causation element to their claims. "This is not only the opinion of Dr. Clark. His treating oncologist did not know of anything that was more likely to cause Mr. Young's cancer than his Mr. Young's [sic] exposure to Defendants' radionuclides." Doc. 160 at 47. However, Plaintiffs recognize that Dr. Matthew does not believe she is qualified to render an expert opinion on causation. Doc. 169 at 2. As such, Dr. Matthew's testimony cannot be used establish the causation element of Plaintiffs' claims.

Because Plaintiffs' lack of evidence on the causation elements entitles Defendants to judgment as a matter of law, the Court need not address the remaining arguments in Defendants' motion. Likewise, because granting the motion for summary judgment disposes of this case, the Court need not address the remaining pretrial motions.

**IT IS THEREFORE ORDERED** that Defendants' Joint Motion to Exclude Expert Testimony of Jody Latimer (Doc. 144) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Joint Motion to Exclude the Expert Opinions and Testimony of James Clark (Doc. 145) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 146) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Joint Motion to Exclude Expert Testimony of William Clark (Doc. 156); Defendants' Joint Motion to Exclude Causation Opinions and Testimony of Lynn Matthew, M.D. (Doc. 157); Defendants' Joint Motion in Limine (Doc. 158); Defendants' Motion to Strike Affidavit of W. Fields (Doc. 174); and Defendants' Joint Motion to Stay Remaining Pretrial Deadlines and Trial (Doc. 200) are **DENIED as moot**.

**IT IS SO ORDERED**.

This case is closed.

Dated this 1st day of December, 2025.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE